HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KENNETH W WITT & KIT WITT,<br><br>    Plaintiffs,<br><br>v.<br><br>PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD,<br><br>    Defendant. | CASE NO. C16-5202-RBL<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

THIS MATTER is before the Court on Defendant Hartford's Motion for Partial Summary Judgment on Plaintiff Witts' contract claims. [Dkt. #12]. The Witts purchased a Hartford homeowners policy for their home, which was damaged by fire in February, 2015. Hartford has paid more than $650,000 for the claim. The case (and this motion) involves three areas of continued dispute over Hartford's obligations under the policy:

(1) The policy covered the structure for $251,000 ("Coverage A"), which was extended if the structure was replaced. Hartford argues that the extended replacement limit is capped at 1.5 times the stated coverage, or $376,500. The Witts claim that the coverage was extended for an *additional* 1.5 times the stated structure coverage, or [$251,000 + (1.5 x 251,000)] = $627,500.

Hartford argues that this is a plain vanilla contract construction issue and that the Witts' reading is wrong as a matter of law. The Witts argue that the contract is unambiguous and that their reading is correct, and that if it is ambiguous it must be construed in their favor.

(2) The policy included an additional living expenses, or ALE, coverage. The Witts claim that Hartford's adjuster agreed to pay them $1400 per month to live in a cabin on the property, in lieu of paying them significantly more to live in a rental home. In reliance on that promise, they refurbished the cabin to make it livable.

The Witts' claim depends on their public adjuster's claim that the promise was made, and their own claim that they reasonably relied on it. Hartford ultimately paid $5650 for this work, but denies that it ever agreed or promised to pay the Witts any monthly amount to live in their own cabin. Hartford argues that the policy is clear that ALE coverage is triggered only where such expenses are actually incurred, that they consistently told the Witts this, and that there is no evidence in support of the Witt's claim.

(3) The policy included an "ordinance and law" coverage, which pays for cost increases due to building code enforcement. The Witts claim they incurred additional costs (a total of $54,200, of which Hartford has paid $32,350) due to code compliance. The Witts therefore claim an additional $21,850 for increased code compliance costs. Hartford claims that it already characterized repair costs that would not have otherwise been payable (due to the cap discussed above) as code costs, and denies that it owes any additional amounts.  It claims there is no support for the Witts' additional code claim as a matter of law.

**A.  Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining

whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

**B.  Coverage A included a 150% cap, not an additional 150% coverage, for structure replacement.**

There can be no dispute about the terms of the policy, despite the fact that it requires the reader to look in multiple places to find those terms. It states:

> B. If there is a loss to the building insured under Coverage A that exceeds the Coverage A limit of liability shown in the Declarations:
>   1. We will increase the Coverage A limit of liability to equal the current "replacement cost" of the building. However, in no event will such increased limit exceed __*__ times the Coverage A amount shown in the Declarations.

[Dkt. #113-15 at 31] The asterisk refers the reader to an endorsement, which provides that the entry "may be left blank if shown elsewhere in the coverage." Hartford claims that the applicable "elsewhere" is the Policy Declarations, which provide that the "additional limits coverage" is "CAP 1.5." *See* Dkt. #13-15 at 4.

The Witts claim that this coverage provides an *additional* 1.5 times the base structure coverage of $251,000—or a total of **2.5 times** the stated coverage. But there is no legal or logical support for this argument.

The word "additional" does not appear in the coverage; instead, in the event of replacement (rebuilding), the limit is increased, but shall not exceed "[1.5] **times** the amount [$251,000] shown" in the Declarations. There is no other way to reasonably read this unambiguous provision: the increased replacement coverage is capped at 1.5 times the base coverage. $251,000 times 1.5 is $376,500. There is no support for the claim that the limit is *increased by* an *additional* 1.5 times the base amount. Hartford's reading is correct, as a matter of law, and the Witts' is not. Hartford's motion for partial summary judgment on the applicable replacement coverage is **GRANTED**.

**C. The Witt's ALE claim fails as a matter of law.**

The Witts' claim $1400 per month in "loss of use," or Alternate Living Expenses, for living in the cabin on their property. They do not dispute that the policy's ALE coverage applies only where the additional living expense is actually incurred. They claim instead that, at an unspecified time, an unidentified Hartford adjuster promised their public adjuster that the insurer would pay them to stay in their cabin. There is no claim or evidence that the promise was

written. Specifically, their public adjuster, Jack Thomas, claims the "Hartford adjuster" promised that Hartford would pay the Witts $1400 per month to live in the cabin, and that in reliance on that promise the Witts spent almost $6000 making it livable. Then, Thomas claims, Hartford reneged on that promise:

> 14. However, months later, The Hartford went back on their promise, citing the Policy language that Additional Living Expenses were only those that are actually incurred, and refused to pay the $1,400 per month. Attached hereto as Exhibit D is a true and correct copy of a letter from the Hartford adjuster dated July 27, 2015.

[Dkt. #16 at 3]

Kit Witt's declaration confirms that any promise was made to Thomas, and not to her:

> 9. We were informed by our public adjuster that The Hartford would compensate us $1,400 per month if we decided to live on a small cabin located on our property. As it was our preference to remain on the property, we obtained help from our friends to make the cabin liveable.

[Dkt. #17 at 2]

Hartford denies that it or its adjuster did or would make such a promise, given the policy's clear language. Thomas's own documents undermine his vague claim that there was such an agreement. Some five months after the fire, after the cabin renovations had been completed, and after the Witts moved in, (and after Thomas had corresponded with Hartford on various other matters, without mentioning any promise) Thomas contacted Hartford's adjuster about the loss. He wrote:

> The loss of use matter **remains unresolved**. Again, the insured **will agree** to a rental allowance of $1500 per month. . . . They **will** stay in the cabin on the property, but **only if you agree** to the $1500 rental allowance.

[Dkt. # 13-5 at 2 (emphasis added)].

This is not evidence of Hartford's past promise to pay $1400 per month; it is evidence that, the through their public adjuster, the Witts offered to stay in the cabin *if* Hartford agreed to pay $1500 them per month. Hartford's adjuster, Baldwin, promptly rejected that offer, because the policy did not cover alternate living expenses that were not actually incurred:

> With regards to the Additional Living Expense coverage, we owe for incurred and documented expenses. We cannot pay the insured to live on their own property. If they move to the neighbor's house and pay a rental fee; please submit the rental contract for consideration.

[Dkt. #13-6]. There is no evidence or claim that Hartford ever agreed to pay such an amount at a later date, though it is apparent that the Witts continued to live in the cabin. On October 19, Thomas again raised the issue of the ALE, both with respect to the $1400 and to the cabin refurbishment costs:

> We have discussed the Loss of Use Claim at the onset of this matter. You indicated your company would be receptive to compensating the insureds the amount of $1,400.00 per month to live in the cabin on their property. Under the pretense of possible ocmpenstation, the insureds remolded the cabin to make it habitable. They did so at out-of-pocket expenses of $5,650.08 for materials. Friends and family members volunteered their time for labor to remodel the cabin. Shortly after the insured's moved into the cabin, your company refused to compensate the insured's. However, you have requested the receipts for the remodel of the cabin, which are enclosed with this correspondence.

[Dkt. #13-9] Hartford claims they did not get the letter for about a month. In any event, on October 21, Baldwin similarly asked Thomas to document the cabin refurbishment costs:

> With regards to the Additional Living Expense coverage, the coverage is for the increased cost of living expenses for incurred expenses. You have not yet provided any receipts or documents to support any additional living expense claim per the policy language. I indicated we would pay any rental fees incurred by the insured if they moved to a rental home. As no information has been provided for a rental, it appears the Witt's have remained in the cabin they own on the residence premises.
> I asked you to document the repair costs to the cabin located on the insured property in order for consideration to be given for any covered claim. To date, I have not received any information with regard to actual incurred costs for repairs to the cabin. If you have receipts for restoration of the cabin, please send them in.

[Dkt. #13-8] It is undisputed that these costs (after some adjustment) were paid in December, 2015. Shortly before she retired, Baldwin informed Thomas of the payment:

ORDER GRANTING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 6

> With regards to repairs to the cabin for the insured's living space for duration of the repairs, payment was issued yesterday in the amount of $5,479.75. This check is also directed to your office and is based on the attached review/spreadsheet of the submitted invoices. As a reminder, these receipts were sent in Mid- November by you and I had to sort out the receipts as they were mixed with contents receipts.

[Dkt. # 13-10]

The Witts argue that Hartford is estopped from denying its promise to pay $1400 per month because they relied on that promise to refurbish the cabin. Hartford argues that equitable estoppel cannot create coverage where none existed. *See Baker v. The Pheonix Ins*. Co., 2013 WL 3208564 (W.D. Wa. 2013) and the cases cited therein. [*Cited* by Hartford in its Reply; Dkt. # 19 at 5]. It also argues that the Witts cannot establish the requirements for estoppel, in any event: they cannot show reasonable reliance on the vague promise to a third party that they allege, and they certainly cannot claim they relied on any such promise after their offer to accept $1500 per month was rejected on July 27, 2015. [*See also* Dkt. #13 at Exhibits 7 and 8]. Their investment in the cabin is not reliance because Harford promptly reimbursed them for those costs when they were presented, presumably under the ALE coverage.

The Witts' claim for ALE coverage in the form of $1400 per month for living in the cabin on their property is unsupportable as a matter of law. Hartford's Motion for summary judgment on this claim is GRANTED, and that claim is dismissed with prejudice.

**D.  Code compliance.**

Hartford's policy provided an additional coverage for code compliance and related costs, which was limited to an additional 10% of "Coverage A." The basis of the Witts' code cost claim is not clear[1]. Their Response asserts only that the number sought and the number paid are not the same. It does not articulate, or demonstrate, any discrepancy, and it does not address the fact that

---

[1] Indeed, it is not entirely clear that they continue to assert this claim at all. Footnote 2 in their Response concedes that the code claim has been "paid in full." [Dkt. # 15 at 5, note 2].

the code compliance limit is $37,650 (10% of the increased Coverage A), which more than Hartford paid but far less than they seek. Instead, they argue only:

> Regarding the code claim, the Witts submitted a total code claim of $54,200.18, of which The Hartford has only paid $32,350.54. A balance of $21,849.64 remains to be paid.

[Dkt. #15 at 9] Adjuster Thomas's testimony in support of this claim is similarly conclusory:

> 21. Regarding the Witts' code claim, the total value of the code claim submitted was $54,200.18. Of that, The Hartford has paid $32,350.54. The Hartford, in its motion for partial summary judgment references the Witts' code claim to be $26,597.87, specifically referencing my letter and submission of March 10, 2016. However, this submission was not the entirety of the code claim – as was specifically referenced in that letter. Thus, The Harford has NOT, in fact, paid the full value of the code claim, but has underpaid by $21,849.64.

[Dkt. # 16 at 4].

This is an argument, or a conclusion; it is not evidence. The Witts have not established that Hartford breached its contract to cover increased code compliance costs. Hartford's Motion for Summary Judgment on this claim is GRANTED.

***

Hartford's Motion for Partial Summary Judgment on all three issues is GRANTED.

IT IS SO ORDERED.

Dated this 19th day of January, 2017.

Ronald B. Leighton
United States District Judge